UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

UNITED STATES OF AMERICA          *      CRIMINAL NUMBER  10-0128


VERSUS                            *      JUDGE ROBERT G. JAMES


SALVADOR GONZALEZ-                *      MAG. JUDGE KAREN L. HAYES
HERNANDEZ

REPORT AND RECOMMENDATION

     Before the undersigned Magistrate Judge, on reference from the District Court, is a
motion to suppress, as supplemented [doc. #s 20 & 25] filed by defendant, Salvador Gonzalez-
Hernandez.  For reasons stated below, it is recommended that the motion be **DENIED.**

     On April 13, 2010, Sergeant John Dupree, a Ouachita Parish Sheriff's deputy (sometimes
referred to as "Dupree" or "Deputy Dupree"), stopped Salvador Gonzalez-Hernandez
("Gonzales") for a traffic violation on Interstate 20 in Ouachita Parish, Louisiana.  Pursuant to
the stop, the Ouachita Parish Sheriff's Office ("OPSO") ultimately uncovered packages of
cocaine stashed inside of two hidden compartments cut into the roof of the cab of the 18- wheel
tractor trailer driven by Gonzalez.

     On April 29, 2010, a federal grand jury returned a one count indictment against Gonzalez
for his alleged knowing and intentional possession with intent to distribute five kilograms or
more of cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii).  On July 16, 2010,
Gonzalez, via counsel, filed the instant motion to suppress all of the evidence that was seized as a
result of the stop and search of his vehicle.  Gonzalez supplemented his motion to suppress on
August 3, 2010.  [doc. # 25].  Following a delay for briefing and an evidentiary hearing that was

held on October 19, 2010, the matter is now before the court.[1]

## Background

The following facts were established via the testimony and evidence presented at the October 19, 2010, hearing held in this matter.[2]

During the relevant period, OPSO deputy John Dupree was a member of a narcotics interdiction team, charged with uncovering illegal narcotics transported on the interstate through Ouachita Parish.  (Tr. 31).[3]  During the relevant period, Dupree had approximately eight years experience with the OPSO, and had attended several classes on trafficking and narcotics detection.  (Tr. 3-4).  Since 2004, he has been involved in perhaps two thousand traffic stops, with five to seven hundred of them resulting in arrests.  (Tr. 5).

Master Sergeant Stan Felts ("Felts") of the OPSO supervises the Interstate Criminal Apprehension Team.  (Tr. 58).  Felts has 16 years experience in law enforcement, including patrol work and narcotics investigations.  (Tr. 57-58).  He has been involved in narcotics interdiction since 2001, and has attended thousands of hours of narcotics training.  (Tr. 63-64).

On April 13, 2010, at approximately 13:50 Sergeant Dupree was on stationary patrol, with his vehicle facing south, in the I-20 median in West Monroe, when he observed an

---

[1]  Defendant filed a post-hearing brief on November 9, 2010.  [doc. # 40].  Although the court accorded the government until November 23, 2010, to submit its post-hearing brief, the government notified chambers on November 16, 2010, that it would forego the opportunity to file an additional brief.

[2]  One of the exhibits introduced into evidence was a contemporaneous video and audio recording of the traffic stop captured by a dash-mounted camera in Deputy Dupree's patrol car. The associated audio feed was captured by a microphone that was affixed to Dupree.  The microphone recorded sounds and conversations in Dupree's immediate vicinity.  To the extent that there is an irreconcilable conflict between the testimony of the witnesses at the hearing and the contemporaneous video and audio recording, the court defers to the recording.

[3]  References to the hearing transcript are abbreviated to "Tr."

2

eastbound Kenworth 18-wheel tractor trailer traverse the "rumble strips" that mark the edge of the lane. (Tr. 6-7).[4] He also heard the tires roll over the rumble strips. *Id*. This constituted a traffic violation for improper lane usage. *Id*. He also noticed that the tractor trailer was following too closely (12-15 feet) behind another vehicle. (Tr. 7). Accordingly, Dupree pulled out behind the truck and observed it cross the fog line once or twice more between mile marker 105 and the Well Road exit. (Tr. 7). Before initiating the stop, Dupree pulled up alongside the truck to obtain the license plate number. (Tr. 27).

At approximately 13:52, the in-dash video camera in Dupree's car began recording. According to the program associated with the video,[5] Dupree did not activate his car's blue and red lights until the tractor trailer had already entered the Wells Road exit ramp, apparently of its own volition. Moreover, as the truck navigated the turn onto the exit ramp, the video captured the truck's passenger-side wheels traversing the white fog line and rumble strips. Dupree did not activate his lights until after this latest lane infraction occurred. The tractor trailer came to a stop at approximately 13:53.

At 13:53:41, Dupree stood on the truck's side-rail and opened the passenger-side door of the cab. (Tr. 9). He told the driver, later identified as Salvador Gonzales, the reason for the stop and inquired whether there was anyone else on board. He then asked Gonzales for his paperwork and learned that Gonzales was hauling a load of pickles originating in Hidalgo, Texas. Among other things, Dupree asked who owned the truck, how long Gonzalez had been driving the truck, and whether he had any drugs or weapons. (Gonzalez denied having any drugs or weapons).

---

[4] The rumble strips are eight to ten inches beyond the fog line of the roadway. (Tr. 7).

[5] The program includes a box which is illuminated when the vehicle's flashing lights are activated.

During this initial encounter with Gonzalez, Dupree noticed several religious items displayed in the cab, including the Virgin Mary, and some patriotic American Eagle symbols on the dashboard. (Tr. 9, 26).  Upon questioning, Dupree could recall four religious symbols -- two were hanging from the dashboard area, the others were stickers affixed to the dashboard.  (Tr. 10, 29).  Dupree testified that religious symbols displayed by Hispanics is sometimes, but not always an indicator of illegal activity – not drug activity.  (Tr. 29-30).  Religious and patriotic symbols are commonly associated with drug and contraband trafficking.  (Tr. 11).  Some people use the symbols to throw off officers; religious people use the symbols to pray for safe passage.  *Id*. Dupree's perceptions regarding the significance of the symbols were formed by classes that he attended and from discussions with other suspects.  (Tr. 11-12).

Dupree further observed that Gonzalez seemed very nervous, avoided eye contact, and appeared "kind of stunned."  (Tr. 10).  He seemed to shake when he handed over his paperwork and driver's license.  *Id*.  Dupree obtained Gonzalez's driver's license, his truck booklet, insurance, and dates in-service and out of service.  *Id*.  According to Dupree, he obtained Gonzalez's logbook later, while waiting for Gonzalez's criminal history and driver's license check to come back.  (Tr. 30-31).  At 13:55:45, Dupree told Gonzales to hold on, and that he would be back.

By 13:56:17, Dupree had returned to his patrol car.  At 13:58:47, dispatch reported that the trailer was out of Mercedes, Texas.  When Dupree ran Gonzalez's driver's license through the ThinkStream computer database, he discovered that Gonzalez had a prior arrest for cocaine around 1991, in Arizona.  (Tr. 12-13).  While he was waiting for the results of the check on Gonzalez's driver's license, Dupree prepared a Louisiana traffic citation for improper lane usage

4

and for following too close.  (Tr. 14-15; Gov.'t Exh. 2).[6]  Nevertheless, based upon the religious

symbols, Gonzalez's nervousness, and the prior drug arrest, Dupree requested assistance from

Sergeant Felts at 14:01:07.  (Tr. 16).[7]  These indicators caused Dupree to have what he described

as a "hunch," as opposed to "probable cause," that Gonzalez was involved in illegal activity.  (Tr.

34-35).  Dupree also acknowledged that the I-20 corridor, through Monroe, is a high drug traffic

area.  *See* Tr. 47.[8]

> At 14:02:22, Dupree exited his vehicle and reached the passenger-side door of the rig at

14:02:40.  At 14:03:15, he asked Gonzalez to accompany him to the rear of the trailer.  (This

marks Gonzalez's first appearance on camera).  At 14:04:15, Dupree asked Gonzalez where he

was traveling to.  Dupree asked Gonzalez to retrieve his logbook at 14:04:24, and accompanied

him to and from the cab.  At 14:05:17 Dupree began to review the logbook as he continued to

speak with Gonzalez.  The logbook revealed several time discrepancies.  (Tr. 17).  For instance,

it indicated that it took Gonzalez six hours to travel from Van, Texas, to Monroe, Louisiana,

when it should have taken him about three hours.  *Id.*[9]  Dupree testified that a time discrepancy is

an indicator of illegal activity.  (Tr. 40).

> Dupree asked Gonzalez such questions as who owned the truck and whether he had ever

---

[6]  Dupree later testified, however, that Gonzalez was seated next to him when he filled out the citation.  (Tr. 42).  If so, then the citation was not completed until the search was already under way.  *See* discussion, *infra*.  In any event, Dupree did not give Gonzalez the citation until after he was interviewed back at Metro Narcotics.  (Tr. 41-42).

[7]  During his brief conversation over the radio with Felts, Dupree also questioned whether it was normal for the trailer's small observation door to be locked.  Felts replied that he did not think that this sounded right.

[8]  Deputy Felts testified that they stop a lot of 18 wheelers because cartels tend to use 18 wheelers to haul larger amounts of drugs.  (Tr. 68).

[9]  The log showed that Gonzalez left Van, Texas, at around 8:30 in the morning.  (Tr. 18).

been arrested before.  Deputy Felts arrived on scene at 14:06:13 and began to review the logbook while Dupree listened to Gonzalez's lengthy explanation about his prior arrest.  Gonzalez acknowledged an arrest in 1984, but denied being arrested in 1992.  At 14:09:16, Dupree told him to "hold on," and returned to his car.  Dupree resumed his questioning of Gonzalez at 14:09:33, after confirming the prior arrest in 1992.[10]  At this point, Gonzalez appeared to indicate that the arrest he had been discussing previously must have occurred in 1992.  During this discussion, Felts was examining the trailer door.

At 14:10:18, Dupree inquired about the lock affixed to the small observation door at the back of the trailer.  Gonzalez explained that he purchased the lock.  At 14:11:06, the deputies had Gonzalez confirm that he had no drugs, marijuana, cocaine, or methamphetamine in the truck.  Felts observed that Gonzalez's hands were shaking, and that he was unusually nervous.  (Tr. 66).  At 14:11:35, Felts asked Gonzalez, in Spanish, for permission to search the truck.[11]  Gonzales nodded his assent and pointed toward the cab.  Felts did not inform Gonzalez that he was able to stop the search at any point.  (Tr. 74).  Felts also did not know whether Gonzalez knew that he could refuse consent.  (Tr. 75).  Felts walked to the cab and disappeared off-camera.

Meanwhile, at 14:12:07, Dupree told Gonzalez that he was not going to jail, but advised him of his *Miranda* rights, and asked him whether he understood them and wanted to talk to him.  Dupree testified that after he advised Gonzalez of his Miranda rights, he became overly nervous.  (Tr. 18).  He looked at the ground and dragged his feet like he was kicking rocks.  *Id*.  Gonzalez

---

[10]  At the hearing, Dupree maintained that Gonzalez had a conviction for a cocaine-related offense.  (Tr. 32-33).

[11]  Dupree testified that Felts requested consent to search in Spanish and English.  (Tr. 19).  Felts testified that Dupree told him that he had obtained consent to search in English.  (Tr. 58-59).  Thus, Felts only felt the need to request and obtain permission to search in Spanish.  *Id*.

exhibited excessive perspiration on his forehead, hands, and neck area from the beginning of the stop until his post-arrest interview.  *See* Tr. 42-43.  Dupree conceded that the video does not show Gonzalez as visibly shaken.  (Tr. 55).  He also admitted that generally everyone shakes, just not to the exaggerated extent that Gonzales did.  (Tr. 56).

     Dupree questioned Gonzalez for the next sixteen to seventeen minutes while Felts conducted the search.  He repeatedly inquired about dope, drugs, and/or cocaine.  Gonzalez told Dupree that he could look inside if he wanted to.  Accordingly, Dupree had Gonzalez unlock and open the observation door so he could look inside the trailer.  At 14:16:47, Dupree told Gonzalez that he needed him "to be real honest if you want some help with it, and don't want to go to jail . . . be honest with me . . . we're going to find it . . ."  Gonzalez denied knowledge of any contraband throughout.

     At 14:20:50, Dupree told Gonzalez to stand pat, as he returned to his car.  Five minutes later, Dupree knocked on the car window and motioned Gonzalez to get in the car.  He then questioned Gonzalez about the owner of the truck.  Dupree had a K-9 dog in the back of his patrol car.  (Tr. 39).

     Meanwhile, when Felts walked up to the cab of the truck, he noticed a three to four inch discrepancy between the height of the roof and the air dam. (Tr. 60).  Furthermore, when he entered the vehicle, he smelled a strong, unknown chemical odor.  *Id*.  He ran his hand along the headliner and felt fresh glue.  *Id*.  This told him that someone had recently tampered with the headliner, which raised his suspicions.  *Id*.  Accordingly, he pulled back the headliner and found foam, with incision marks.  *Id*.  This was abnormal.  *Id*.  He pulled the foam back, and noticed welding cuts in the colored metal, which was an aftermarket alteration.  *Id*.  Therefore, he removed the headliner and discovered two cut out openings held to the roof by a latch.  *Id*.; *see*

Gov.'t Exh. 3.  Felts opined that the compartments were indicators of drug activity.  (Tr. 61).

Felts, however, could not open the compartment with his hand, so he went back to his vehicle to obtain a screwdriver at 14:28:41.  (Tr. 61).  At 14:29:30, Felts told Dupree that he had found a compartment.  At first, Dupree did not believe him, but Felts repeated himself, stating that he did not know if the compartment was empty or full.  Felts asked Dupree if he wanted to go ahead and handcuff Gonzalez.  Dupree opted to do so, and instructed Gonzalez to step out of the car and turn around.  Felts testified that Gonzales was handcuffed for officer safety because suspicions are heightened when a compartment is found.  (Tr. 69).  Felts returned to the truck at 14:30:46.  Dupree attempted to elicit further information from Gonzalez, without success.

When Felts returned to the cab, he could not open the compartments, but he observed the packages hidden inside.  (Tr. 61-62).  He used a knife and screwdriver to slice a bag open, and retrieved a white powder which ultimately tested positive for cocaine.  *Id*.  Felts returned at 14:33:45, stating that he had uncovered white powder that he thought was cocaine.  The OPSO did not open the compartments until they transported the rig to Metro Narcotics.  (Tr. 21).  The compartments secreted 48 kilograms of cocaine.  *Id*., Gov.'t Exh. 4.  The video recording ends at 14:37:15.

Dupree testified that Gonzalez appeared to understand English and that they had no problem with communication.  (Tr. 16).  Indeed, the video reveals that Gonzalez generally understood the deputies' questions, and often proffered lengthy responses, albeit in heavily accented English.[12]  Dupree conceded that Gonzalez remained compliant and non-aggressive. (Tr. 26).  Dupree did not fear for officer safety at any time.  (Tr. 26).

At the hearing, Gonzalez testified that he never talked to the second officer.  (Tr. 82).  His

---

[12]  The court appointed an interpreter to assist Gonzalez in these proceedings.

testimony, however, is belied by the video and Gonzalez's gesture towards the front of the cab.

Gonzalez further stated that he understood everything the deputies said.  (Tr. 81).  He

acknowledged, however, that it was possible that he did not hear the second officer's question or

did not understand him.  (Tr. 82).  Gonzalez stated that the first officer asked him in English for

permission to search the vehicle.  (Tr. 82).  The first officer asked him where the drugs were, and

he told him to go ahead and search the vehicle.  (Tr. 83).  Gonzalez admitted that he told the first

officer that he could search the vehicle.  (Tr. 84).  He supposed that the officer finished his search

when he closed the small door.  (Tr. 85).  His permission ended there.  *Id*.  He did not have time

to tell the second officer that he did not want him to search the vehicle.  (Tr. 85).

<u>**Law and Analysis**</u>

**I.      The Stop and Detention**

"A person is seized by the police and thus entitled to challenge the government's action

under the Fourth Amendment when the officer, by means of physical force or show of authority,

terminates or restrains his freedom of movement, through means intentionally applied."  *Brendlin*

*v. California*, 551 U.S. 249, 127 S.Ct. 2400, 2405 (2007) (citations and internal quotation marks

omitted).  A traffic stop entails a seizure for purposes of the Fourth Amendment.  *Id*.; *see also,*

*United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004) (en banc) (stopping a vehicle and

detaining its occupant(s) constitutes a seizure).  Traffic stops, whether supported by probable

cause or a reasonable suspicion, are treated as *Terry* stops.  *Brigham, supra*.  (citations omitted).

Under *Terry*, a law enforcement officer may temporarily detain a person when the

"officer has a reasonable, articulable suspicion that a person has committed or is about to commit

a crime."  *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citing *Terry v. Ohio*, 392

U.S. 1, 30, 88 S.Ct. 1868 (1968)).  Reasonable suspicion may be described as "'a particularized

and objective basis' for suspecting the person stopped of criminal activity."  *Id*. (citing *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657 (1996)).  To satisfy the Fourth Amendment, the stopping officer must be able to "articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity."  *Id*. (citing *Illinois v. Wardlow*, 528 U.S. 119, 123-24, 120 S.Ct. 673 (2000)).  The Fourth Amendment requires but a "minimal level of objective justification for making the stop," and requires "a showing considerably less than preponderance of the evidence."  *Id*. (citation omitted).  The validity of the stop is determined under "the totality of the circumstances-the whole picture."  *Id*.  (citing *United States v. Sokolow*, 490 U.S. 1, 7-8, 109 S.Ct. 1581 (1989)).

A *Terry* analysis is two-tiered:  (1) whether the officer's action of stopping the vehicle was justified at its inception; and (2) whether the officer's actions were reasonably related in scope to the circumstances that justified the stop.  *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993) (citing *Terry*, 392 U.S. at 19-20); *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir. 2001).  Typically, the defendant bears the burden of proving by a preponderance of the evidence that the challenged search or seizure was unconstitutional.  *United States v. Waldrop*, 404 F.3d 365, 368 (5th Cir. 2005) (citation omitted).   However, when the law enforcement officer acts without a warrant, the government bears the burden of proving that the search was valid.  *Id*.

        a)         <u>*Terry's* First Prong</u>

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle."  *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).

In this case, Deputy Dupree observed (and heard) the passenger-side tires of Gonzalez's vehicle traverse the "fog" line that marks the edge of the travel lane – not once, but several times. He also testified that the tractor trailer was following another vehicle too closely. Having observed and listened to Deputy Dupree at the hearing, the court finds his testimony to have been earnest, persuasive, and entirely credible. His testimony is further corroborated by the video recording.

In Louisiana, a vehicle that partially leaves its lane of travel and crosses the fog line either at the center of a divided highway or on the right hand shoulder of the road provides probable cause to believe that a traffic violation for improper lane use has occurred. *State v. Waters*, 780 So.2d 1053, 1056 (La. 2001) (citing, *State v. Inzina*, 728 So.2d 458, 466 (La. App. 2d Cir.12/9/98)); *see also United States v. Jones*, 185 F.3d 459 (5th Cir. 1999) (crossing "fog" line in Louisiana provides probable cause to support a stop). Furthermore, a law enforcement officer is authorized to stop a vehicle when he observes the vehicle following another vehicle too closely. *State v. Arnold*, 779 So.2d 840, 846 (La. App. 2nd Cir. 2000) (citation omitted); and La. R.S. 32:81. It is manifest that Dupree had probable cause to stop Gonzalez.

    b)    *Terry's* Second Prong

The second prong of the *Terry* inquiry focuses upon whether the stopping officer's actions were

> reasonably related to the circumstances that justified the stop, or to dispelling his reasonable suspicion developed during the stop. This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop unless further reasonable suspicion, supported by articulable facts, emerges.

*Brigham*, 382 at 507 (citations omitted).

The Fifth Circuit has recognized that pursuant to an initial traffic stop, a police officer may (1) examine the driver's license and registration of the driver and vehicle, and run a

11

computer check to investigate whether the driver has any outstanding warrants and if the vehicle

was stolen; (2) ask the driver to exit the vehicle; and (3) ask the driver and any passengers about

the purpose and itinerary of their trip, including other unrelated questions.  *See generally*

*Brigham*, 382 F.3d at 508; *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999); *Shabazz*,

993 F.2d at 437.  "[T]he officer's questions need not even be related to the purpose of the traffic

stop, since '[d]etention, not questioning, is the evil at which *Terry's* second prong is aimed.'"

*Lopez-Moreno*, 420 F.3d at 431.   Detention during these actions is reasonable under the Fourth

Amendment.

"Although an officer's inquiry may be wide-ranging, once all relevant computer checks

have come back clean, there is no more reasonable suspicion, and, as a general matter, continued

questioning thereafter unconstitutionally prolongs the detention."  *Lopez-Moreno*, 420 F.3d at

431 (citations omitted).  "[T]o continue a detention after such a point, the officer must have a

reasonable suspicion supported by articulable facts that a crime has been or is being committed."

*United States v. Santiago*, 310 F.3d 336, 342 (5th Cir. 2002) (citation omitted).  "[I]f additional

reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has

been fulfilled, then the detention may continue until the new reasonable suspicion has been

dispelled or confirmed."  *Lopez-Moreno*, 420 F.3d at 431 (citations omitted).  Reasonable

suspicion "exists when the detaining officer can point to specific and articulable facts that, when

taken together with rational inferences from those facts, reasonably warrant the search and

seizure."  *United States v. Estrada*,  459 F.3d 627, 631-632 (5th Cir. 2006) (citation omitted).

Reasonable suspicion depends upon the "totality of the circumstances and the collective

knowledge and experience of the officer or officers."  *Id*.

In this case, Dupree's initial questioning of Gonzalez was fully within the scope of the

initial traffic stop.  During the initial encounter, Dupree noted the religious and patriotic symbols displayed in the cab and Gonzalez's excessive nervousness.  Furthermore, in the course of the computer background check, Dupree uncovered a prior cocaine arrest or conviction associated with Gonzalez.

The court is hesitant to accord any significant weight to Dupree's observation of the religious and patriotic symbols displayed in the cab.  At least one court in this circuit has held that it is a violation of a defendant's First and Fourth Amendment rights for an investigating officer to use the defendant's display of a religious statue to support reasonable suspicion of wrongdoing.  *United States v. Magana*, 544 F.Supp. 2d 560 (W.D. Tex. 2008).  Similarly, other circuits have determined that the presence of religious iconography adds little or nothing to an inference of wrongdoing.  *See United States v. Townsend*, 305 F.3d 537, 544 (6th Cir. 2002); *United States v. Guerrero*, 472 F.3d 784, 788 (10th Cir. 2007).  In addition, patriotic symbols, given their benign display by a significant portion of the traveling public, adds little to the overall equation.  *See Magana, supra* (citing *United States v. Valenzuela*, 365 F.3d 892, 900 (10th Cir. 2004).

Of course, the same arguments could be advanced with regard to travel along a "drug corridor."  However, the courts are prohibited from examining and rejecting individually each factor that the police cite as having creating reasonable suspicion.  *United States v. Pack*, 612 F.3d 341, 358 (5th Cir. 2010), opinion modified on denial of rehearing, ____ F.3d ___, 2010 WL 3790078 (5th Cir. Sep 30, 2010) (citation omitted).  Thus, even if the facts articulated by the officer are individually consistent with innocent travel, taken together they may amount to reasonable suspicion.  *Sokolow*, 490 U.S. at 9, 109 S.Ct. at 1587 (citations omitted); *Pack supra*. Moreover, the court must permit "officers to draw on their own experience and specialized

training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 751 (2002) (citations omitted).  The courts are generally obliged to accord deference and even "great respect" to an officer's training and experience.  *See United States v. Jenson*, 462 F.3d 399, 405-406 (5th Cir. 2006).

Even without considering the display of religious and patriotic symbols, Gonzalez's prior drug arrest, excessive nervousness, and the fact that he was traveling on a known drug corridor,[13] provided Dupree with reasonable suspicion to extend the search.  *See United States v. Sierra*, 294 Fed. Appx. 884 (5th Cir. Sept. 30, 2008) (unpubl.) (nervousness, plus maps of drug trafficking towns not on driver's expressed itinerary created reasonable suspicion of criminal activity); *Pack, supra* (reasonable suspicion of criminal activity created by extreme nervousness, conflicting story, and travel along drug corridor); *Brigham, supra* (citing *United States v. Gonzalez*, 328 F.3d 755, 758-759 (5th Cir. 2003) ("driver's nervousness, hesitation in responding to basic itinerary questions, lies about identification, presence on a drug trafficking corridor, and prior arrests for drug trafficking, taken together, gave rise to a reasonable and articulable suspicion of drug trafficking."); *United States v. Rodriguez*, 155 Fed. Appx. 753 (5th Cir. Nov. 21, 2005) (unpubl.) (driver's delay in pulling over and exiting vehicle, excessive nervousness and sweating, repeated declarations that he wanted no problems, and prior narcotics arrests provided reasonable suspicion).

---

[13]  *Jenson*, 462 F.3d at 405-406 (5th Cir. 2006) (recognizing that I-20 is a known drug corridor).

Because of his reasonable suspicion,[14] Dupree radioed for assistance from his supervisor, Felts, and returned to further question Gonzalez.  At that point, he obtained and reviewed Gonzalez's logbook, which only further heightened his suspicions because of a time discrepancy. Dupree also asked Gonzalez about his prior drug arrest or conviction, but Gonzalez, at least initially, disclaimed knowledge of an incident in 1991-1992.  These additional inconsistencies only fueled the deputies' reasonable suspicion which culminated in their request for Gonzalez's permission to search the tractor trailer.

In sum, the deputies' actions demonstrated a "graduated response to emerging facts, were reasonable under the totality of the circumstances, and did not unconstitutionally extend [Gonzalez's] detention."  *United States v. Pauyo*, 341 Fed. Appx. 955, 956 (5th Cir. Aug. 18, 2009) (unpubl.), cert. denied by *Pauyo v. United States*, ___U.S.___, 130 S.Ct. 2079 (Mar 29, 2010) (citation omitted).[15]

## III.    Consent to Search

At the hearing, Gonzalez indicated that he did not talk to Deputy Felts or grant him consent to search.  Felts testified otherwise.  Furthermore, the video recording supported Felts' testimony.  During the 18 or so minutes that Felts searched the cab, there is no indication that Gonzalez inquired about his whereabouts or attempted to retract his consent.  Gonzalez also testified that he understood the officers.  Accordingly, the court resolves this factual dispute

---

[14]  During the hearing, Dupree testified that he had a "hunch," as opposed to "probable cause."  He needed, however, but reasonable suspicion to extend the encounter – a lesser threshold than probable cause.  Furthermore, despite characterizing his impressions as a "hunch,"Dupree articulated several bases for his reasonable suspicion. Thus, his characterization is not determinative of the issue.

[15]  The deputies sought and obtained consent to search approximately 18 and one-half minutes after the stop began.

against Gonzalez.[16]

Because the deputies developed reasonable suspicion to extend the stop, Gonzalez's consent to search the truck was not unconstitutionally tainted.  *Estrada*, 459 F.3d at 633. Accordingly the government's burden to prove consent is not as great as if there had been an antecedent Fourth Amendment violation.  *Id*. (citation omitted).  Under these circumstances, the court need not determine whether Gonzalez's consent to search the truck was an "independent act of free will."  *Sierra*, 294 Fed. Appx. at 890, n3 (citation omitted).

It is manifest that a valid consent to search must be "free and voluntary."  *Shabazz*,  993 F.2d at 438 (citation omitted).  The government typically carries the burden of proving voluntary consent by a preponderance of the evidence.  *Id*.  "The voluntariness of consent is a question of fact to be determined on the totality of the circumstances."  *Id.*  To determine whether consent to search was obtained voluntarily, the courts consider the following factors, (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police tactics; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) his education level and intelligence; and (6) his belief that no incriminating evidence will be found.  *Id.*  Although all six factors are relevant, no single factor is dispositive. *Id.*

Applying the foregoing considerations here, the court finds that at the time of the consent, the deputies had not returned Gonzalez's paperwork or otherwise told him that he was free to go. Accordingly, this factor is construed against the government.  *Jenson*, 462 F.3d at 407, n9 (citation omitted).  Second, although there were two deputies at the scene (and a passive K-9

---

[16]  Although Gonzalez later granted Dupree access to the observation portal at the rear of the trailer, this search did not uncover any contraband, and is not the focus of the motion to suppress.

unit), virtually all of the questioning was handled by one deputy – Dupree.  At least through the point that the deputies obtained consent to search, they were not overbearing and remained cordial.  Moreover, Gonzalez fully cooperated with the officers and earnestly endeavored to address all of their concerns.  There is no evidence that Gonzalez was aware of his right to refuse to consent.   Also, no evidence was adduced regarding Gonzalez's education and intelligence.  Finally, because the illicit drugs were so well hidden, Gonzalez likely did not believe that they would be discovered.

Upon consideration of the totality of the circumstances, the undersigned finds that Gonzalez's consent was voluntary.  *See e.g., Estrada, supra* (consent freely given where defendants were calm and cooperative and police did not employ coercive tactics).

Once Felts discovered evidence of hidden compartments, he had probable cause to search the compartments at the scene and later at headquarters.  *Estrada, supra* ("evidence of a hidden compartment supports 'probable cause' for a search/arrest . . .").  Discovery of the hidden compartments also gave the deputies probable cause to handcuff and arrest Gonzalez.  *Id*.  Moreover, handcuffing a suspect after the discovery of a hidden compartment is not unconstitutional under a *Terry* stop analysis.  *Estrada*, 459 F.3d at 634-635.[17]

### Conclusion

For the above-stated reasons,

**IT IS RECOMMENDED** that the motion to suppress, as supplemented [doc. #s 20 &

---

[17]   Indeed, Felts testified that Gonzales was handcuffed for officer safety because suspicions become heightened after a compartment is found.  (Tr. 69).  Felts suggested to Dupree the possibility of handcuffing Gonzalez.  Although Felts also believed that the presence of an aftermarket compartment violated Louisiana law (Tr. 80),there is no indication that Gonzalez was arrested for this violation.  Moreover, an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."  *Devenpeck v. Alford*, 543 U.S. 146, 152-154, 125 S.Ct. 588, 593-594 (2004).

25], filed by defendant Salvador Gonzalez-Hernandez be DENIED.

Under the provisions of 28 U.S.C. §636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen(14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.  A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.  Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 23rd day of November, 2010.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE